IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SIEMENS ENERGY AND AUTOMATION, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:06cv0582 |
| ) | |
| CONTROL TECHNOLOGY, INC. and ) | Judge Thomas A. Wiseman, Jr. |
| FASTRAK SOFTWORKS, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Before the Court are defendant FasTrak Softworks, Inc.'s Renewed Motion for Summary Judgment (Doc. No. 109) and defendant Control Technology, Inc.'s Renewed Motion for Partial Summary Judgment (Doc. No. 113). Plaintiff Siemens Energy & Automation, Inc. ("Siemens") has filed a response as well as its own cross-motion for summary judgment (Doc. No. 115).

In its Second Amended Complaint, Siemens asserts thirteen separate causes of action, seven against defendant Control Technology, Inc. ("Control Technology"), two against defendant FasTrak Softworks, Inc. ("FasTrak"), and four against both defendants. (*See* Doc. No. 48.) On July 26, 2007, this Court entered an Order denying the defendants' respective motions for summary judgment as to the four claims asserted against both defendants and the two claims asserted against FasTrak. (Doc. No. 103.) All of the claims implicated by the defendants' motions are based upon FasTrak's alleged misuse of Siemens' confidential information, and the Court's denial of the motions was premised upon the fact that the record was unclear as to what information FasTrak actually used in the development of the products at issue in this case. In the Memorandum Opinion accompanying the Order, the Court specified that the denial of the motions was without prejudice to renewal of the motions once the parties had completed discovery. (*See* Doc. No. 102, at 1.)

For the reasons explained below, the Court finds that there are no material issues of disputed fact; the contract at issue is unambiguous regarding FasTrak's right to use Siemens' information, and the defendants' motions for summary judgment will therefore be granted. Siemens' cross-motion for summary judgment must be denied on the same grounds.

**I.      STANDARD OF REVIEW**

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case." *Beecham v. Henderson County*, 422 F.3d 372, 374 (6th Cir. 2005).

**II.     FACTUAL BACKGROUND**

   *A.     The Parties*

Siemens is a manufacturing company engaged in the business of research, development, promotion, distribution and sale in interstate commerce of innovative technologies and products, including computer hardware, software, electronic components and systems for use in the fields of automation technology and industrial process control. One of Siemens' most important products is a Programmable Logic Controller ("PLC"). Siemens also develops, manufactures and sells peripheral products related to its PLCs, including remote base control modules, power supply modules, relay modules, analog input/output modules, discrete input/output modules, temperature modules, counter modules, communication modules, and network modules, as well as bases or racks into which the PLCs and the various above-referenced modules and other components can be mounted and interconnected to form an inter-operable system. The PLCs and peripheral modules are used to automate specific industrial applications at sites such as manufacturing plants for the purpose of improving business efficiency and increasing industrial output. Automation technology as applied to business-specific industrial process control applications can include control and execution of assembly-line technology, *i.e.*, robotics in all the industrial/manufacturing and/or assembling industries. (6/1/2007 Declaration of Frank Garrabrant (Doc. No. 85) ¶ 2; *see also* 4/4/2007 Declaration of David Sampson (Doc. No. 56) ¶ 2.) The PLC is the primary component of—the "brains" behind—any automated industrial process control system. (4/23/2007 Declaration of Paul Ayers (Doc. No. 61) ¶ 3.).)

Included among Siemens' industrial automation and related products is the "505" product line (the "505 Product Line"), which was originally created and introduced by Texas Instruments in 1986. Siemens acquired the 505 Product Line from Texas Instruments on September 30, 1991. Since then, Siemens has

continued to manufacture the PLCs and related equipment that constitute the 505 Product Line. Siemens has exclusively controlled the 505 Product Line for fifteen years. The primary component of the 505 Product Line remains the PLC. (Doc. No. 85, at ¶ 3.)

As described by Siemens, the 505 PLC is, "in essence, a computer used to control . . . industrial processes. Like most computers, it comprises a Central Processing Unit (CPU), various forms of memory, and input and output mechanisms. End-users can create an 'application program' that is input or loaded into the PLC for operation. Separate and apart from the application program is what is known as 'firmware.' Firmware is low-level software that is embedded in a hardware device, such as read-only memory, and serves as the interface between the hardware in the system and the higher level software (such as application programs)." (Doc. No. 56, at ¶ 4.)

Defendant FasTrak is a small Wisconsin business that creates and licenses software designed to enhance automated factory operations. More specifically, a large part of FasTrak's business is the development of software for various companies' PLCs, including Siemens'. For example, in the mid-1990s FasTrak created the software *PLC Workshop for Siemens 505* (or "*505 Workshop*"), a version of which Siemens markets and sells as *Siemens 505 SoftShop* pursuant to the Software License Contract executed by and between FasTrak and Siemens in December 1996. (Doc. No. 61, at ¶ 3.) Siemens and FasTrak have had an ongoing business relationship since at least 1996 relating to FasTrak's development of the *505 Workshop* and then licensing Siemens to sell it, as discussed below. (Doc. No. 56, at ¶ 9.)

Control Technology is a Tennessee corporation that competes directly with Siemens by manufacturing and selling industrial automation and related products, including various modules and racks, that compete with the 505 Product Line. It produces a line of products it refers to as the 2500 Series that is compatible with Siemens' 505 products.

FasTrak admits that it is providing to Control Technology software that FasTrak created to be compatible with the Siemens 505 Product Line. In creating that software, FasTrak referred to certain technical information related to the 505 Product Line that it obtained from Siemens in the course of developing the *505 Workshop* software. Specifically, FasTrak maintains that it referred only to the version of that technical information that Siemens gave to FasTrak in May 1999 (Doc No. 61, at ¶¶ 2, 14)

and, to a lesser extent, to "some information in a set of updated task code specifications (Specification No. 2457761) that Siemens provided FasTrak in February 2000." (6/19/2007 Decl. of Paul Ayers (Doc. No. 92) ¶ 3.)

Siemens maintains that the information given to FasTrak in May 1999 was simply a revised and updated version of information it had previously conveyed to FasTrak in March or April 1996. The importance of the distinction between information conveyed in the spring of 1996 and information conveyed in May 1999 or February 2000 is that two separate confidentiality provisions are at issue and, depending on whether information falls under the rubric of one or the other, disclosure of it to third parties may or may not be actionable. The first agreement, a "Confidentiality Agreement," was executed in January 1996. The second agreement, the "Software License Contract," was executed in December 1996.

### B. The Confidentiality Agreement

FasTrak and Siemens executed the "Confidentiality Agreement" effective January 23, 1996. (Doc. No. 61-1.) The stated business purpose of the Confidentiality Agreement was the creation of a "WINCC Channel Development Kit," pursuant to which Siemens would disclose proprietary or trade secret information to FasTrak for FasTrak to use to create the "Development Kit." (Doc. No. 48-3, at ¶ 2 & Ex. A.) The Confidentiality Agreement covered "any of [Siemens'] trade secrets and other competitively sensitive data or information disclosed under this Agreement, including, without limitation: technical or nontechnical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, process, financial data, financial plans, product and marketing plans or lists of actual or potential customers or supplies." (Doc. No. 61-1, at ¶ 3.1.) The term "Confidential Information" specifically did not include any information that was not subject to protection as a trade secret or was independently developed by FasTrak. The Confidential Information conveyed by Siemens was to remain Siemens' property, and FasTrak's obligations with respect to the confidential information was to continue in full force and effect for a period of three years or as long as the information or data remains a trade secret, whichever is later. (Doc. No. 61-1, at ¶ 6.6.)

FasTrak ultimately did not participate in the creation of the WINCC Channel Development Kit. Meanwhile, however, FasTrak had informed Siemens that it was working on a Windows version of

software that the owner of a Siemens 505 PLC could use to create customized programming for the PLC. Siemens indicated to FasTrak that Siemens was interested in this new software as a potential replacement for Siemens' "TISOFT" 505 programming software, which was DOS-based and therefore becoming obsolete. (Doc. No. 61, at ¶ 5.) Consequently, in March 1996, FasTrak and Siemens amended the Confidentiality Agreement to provide for Siemens to disclose certain additional information related to the 505 Product Line that would help FasTrak develop its new software to a point at which it could demonstrate that software to Siemens. (*See* "Amendment" (Doc. No. 48-4).) The "Amendment" states in relevant part that Siemens would share additional confidential information "solely for the purpose of development and resale by FasTrak of a 'Windows' version of Simatic *Tisoft* PLC programming software, for Simatic TI505 PLC automation products (hereafter referred to as 'the Products')." (Doc. No. 48-4, at 1.) "Exhibit A" to the original Confidentiality Agreement was expressly revised to cover additional Siemens Confidential Information, specifically, "Series 500 \ 505 Standard Programming Language" identified by Specification No. 2457707. (Doc. No. 48-4, at 2.)

Pursuant to the terms of the Amendment, Siemens shared with FasTrak in or about March and April 1996 "(a) Dwg # 2457707 (Series 500/505 Standard Programming Language Specification); (b) Dwg # 2490111 (Product Specification, Starloop); (c) Dwg # 2806245 (Series 505 SF Programming Language Specification–Description of Simatic 505 SF PGMS, Loops, and Analog Alarms); and (d) TISOFT 2 Rel 6.0 File Formats." (6/1/2007 Decl. of John Wilson (Doc. No. 84) ¶¶ 2, 4.)

### C. *The Software License Contract*

By the end of 1996, FasTrak had developed its *505 Workshop* software to the point where it was ready to demonstrate the product's capabilities to Siemens. Such a demonstration took place and Siemens was apparently impressed, because the parties then began negotiating a contract that would give Siemens the exclusive worldwide rights to sublicense, market, package and distribute FasTrak's software for programming the Siemens 505 PLC. (Doc. No. 61, at ¶ 6.) At the time these negotiations began occurring, FasTrak was aware that Siemens planned to "mature"—that is, stop manufacturing and eventually stop supplying parts and support for—the 505 Product Line, and to encourage customers to upgrade to a new Siemens product line known as the S7. (Doc. No. 61, at ¶ 7.) FasTrak alleges that developing software compatible with the 505 Product Line was an important part of FasTrak's business,

and that FasTrak hoped eventually to develop a 505-compatible "soft PLC," which is a personal computer that is enabled by software to take the place of a PLC. FasTrak therefore wanted to ensure that it could continue this aspect of its business, regardless of future changes to the 505 Product Line by Siemens or in FasTrak's business relationship with Siemens. (Doc. No. 61, at ¶ 7.)

In any event, the parties entered into the "Software License Contract" on December 17, 1996 pertaining to the 505 Workshop software. (Doc. No. 61-3.) As set forth in the Preamble to the Software License Contract, FasTrak had "developed software for programming the Simatic 505 programmable controller system of Siemens . . . and [was] prepared to deliver copies of said software to Siemens. Siemens desires to use and distribute such software under such terms and conditions as set forth herein this Contract." (*Id.*) The Software License Contract generally provides for delivery of the software by FasTrak and payment by Siemens.

In addition, the Software License Contract defines certain terms, including the following:

1.1     "PS" means the specification of the "PRODUCTS".

1.2     "SOFTWARE" means software in object code form with specifications of the PS for programming the Simatic 505 programmable control system of Siemens.

1.3     "DOCUMENTATION" means the technical description and user manuals of the SOFTWARE.

1.4     "PRODUCTS" means the SOFTWARE and DOCUMENTATION and other software of FasTrak for programming the Simatic 505 of Siemens . . . .

1.5     "DELIVERABLES" means the release of SOFTWARE and the pertaining DOCUMENTATION.

1.6     "INFORMATION" means written information of Siemens including software in object form.

(Doc. No. 61-3, at § 1.)

Pursuant to the terms of the Software License Contract, FasTrak was to deliver to Siemens such "Deliverables" as were functionally complete, and Siemens was to deliver to FasTrak the "Information." (Doc. No. 61-3, at ¶¶ 2.1 and 2.2.) The purpose for which Siemens was to deliver to FasTrak the "Information" is not spelled out in the Software License Contract, and certainly there is no provision for compensation to be paid to Siemens in exchange for the Information. Rather, it was clearly anticipated that FasTrak would use the Information as it continued to develop the Software and Documentation, since the Contract lays out Siemens' remedies in the event the Software has errors "not resulting from errors in

INFORMATION." (Doc. No. 61-3, at ¶ 2.4.) The Contract provides that "FasTrak shall not modify the INFORMATION" (Doc. No. 61-3, at ¶ 2.2), and further states that "[u]pon termination of the Contract for whatsoever reason, FasTrak shall return to Siemens the INFORMATION obtained hereunder. . . ." (Doc. No. 61-3, at ¶ 13.4.) The parties agree that the Contract has never been terminated.

Otherwise, the only other reference to Siemens' "Information" in the entire contract appears in Section 9, which states in pertinent part:

> The parties agree that for a period of five (5) years after receipt, neither party shall disclose the PS, Information, the SOFTWARE source code or source related information it receives from the other party that is marked either "Confidential" or "Proprietary" to any other person, firm or corporation or use it for its own benefit, except as provided in this Contract. . . .

(Doc. No. 61-3, at ¶ 9.1) The parties agree that this provision means that confidential information conveyed by either side to the other under the Contract loses its confidential and proprietary character five years after disclosure, and may thereafter be used in any way the receiving party sees fit.

Finally, the Software License Contract contains a merger clause, which states:

> This Contract contains the entire understanding of the parties with respect to the matter contained herein. There are no promises, covenants or undertakings other than those expressly set forth herein, and any other terms and conditions are rejected regardless of content, timing, or method of communication.

(Doc. No. 61-3, at ¶ 14.3.)

### D. The Dispute

In May 1997 and again in May 1999, Siemens sent to FasTrak updated versions of the Series 500/505 Standard Programmable Controller Language (Specification No. 2457707), the Series 505 SF Programming Language Specification (Specification No. 2806245), and the Series 500 Communication Task Code Compatibility Specification (Specification No. 2457751), all of which had previously been provided to FasTrak in the spring of 1996, under the Amendment to the Confidentiality Agreement. (Ayers Decl. Doc. No. 61 ¶¶ 11–12 and Exs. 4, 5; Doc. No. 82, at ¶ 5.) According to FasTrak, the revised technical information "helped FasTrak ensure that its own 505 programming software used instructions that would download to the 505 PLC without error and could successfully send information to, and read information from, the 505 PLC." (Doc. No. 61, at ¶ 11; *see also* Ayers Dep. (Doc. No. 120) at 48:13–20 ("We assumed that, from our view point and from an engineering standpoint, you always want the latest stuff. . . . They can make changes within the controller that made some of the older stuff obsolete. So we

always wanted to make sure we had the most current information. The controller was, at that time, dynamic. There were changes going on.").) FasTrak points out that Siemens had no reason to send FasTrak this information relating to the 505 Product Line other than pursuant to the Software License Contract, so that FasTrak could further develop and keep current the software for the Siemens 505 PLC that FasTrak continued to license to Siemens under the Software License Contract. Siemens, on the other hand, argues that the new information in the revised specifications was "separate and distinct from the Op-Code programmable features of the prior versions of the specifications" (Doc. No. 82, at ¶ 5), and that, to the extent the new documentation duplicated information previously provided under the Confidentiality Agreement, it remained confidential.

In 2005, FasTrak began marketing a new product: simulator software for PLCs. (Doc. No. 61, at ¶ 14.) This software enables a personal computer to simulate a PLC, which allows programmers to develop customized programming for their PLCs more efficiently. (*Id.*) In December 2005, FasTrak began marketing a version of this software, called the "*505 Simulator*," designed to be used for developing programming for the Siemens 505 PLC. FasTrak maintains that in developing the *505 Simulator* it referred only to the written technical information for the 505 that Siemens had given to FasTrak in May 1999 and July 2000, which is covered by the Software License Contract, and not to any information provided during the Spring of 1996, which would be covered by the Confidentiality Agreement. Siemens, on the other hand, maintains that the "technical information that enabled FasTrak to develop the Relay Ladder Logic (RLL) Editor [used in the *505 Simulator*] included at least the #2457707 DWG documentation that [Siemens] had provided FasTrak in March 1996, under the Confidentiality Agreement. . . ." (Doc. No. 84, at ¶ 2.)

Meanwhile, FasTrak had "long been in discussions" with Control Technology about providing it with software that would operate with a new PLC Control Technology had been developing in anticipation of Siemens' maturing of the 505 Product Line and that could replace the 505 PLC. (Doc. No. 61, at ¶ 16.) Control Technology first approached FasTrak about participating in a project to develop a PLC that would compete with Siemens' 505 PLC in January 2001, well before FasTrak began marketing the *505 Simulator*. (Doc. No. 119, at 13–15.) FasTrak did not begin adapting the *505 Simulator* for Control Technology's use until several years later. (Doc. No. 112, at ¶ 3.) One of the specific goals of Control

Technology's "PLC Project" was to emulate the Siemens 505 PLC. (Herriges Dep. (Doc. No. 119), at 108–10.) FasTrak and Control Technology decided to split the creation of the Control Technology PLC control system between them: Control Technology created the code that formed a control system shell for the program created by FasTrak that executes the logic in the Control Technology PLC, called the "ULESS" (user logic execution subsystem). (Herriges Dep. at 40, 176–78, 194–85.) There is no dispute that FasTrak adapted its *505 Simulator* in order to create the ULESS, and that the *505 Simulator* was developed using specifications FasTrak had received from Siemens. To adapt the *505 Simulator* for use in Control Technology's PLC, FasTrak did not use any additional Siemens-provided information (other than that used to create the *Simulator* in the first place). (Doc. No. 61, at ¶ 17.) In July 2007, Control Technology began selling four types of PLCs incorporating the ULESS. (Peck Dep. (Doc. No. 121) at 21, 39–40 & Ex. 4.)

Since the parties have completed discovery, Siemens, through John Wilson, has had the opportunity to closely compare the two versions of the 1996 and 1999 versions of the 2457707 specification and the ULESS. As a result, Wilson has concluded that "a substantial amount of the information in the 1996 Specifications was used to create the files in ULESS." (10/29/2007 Decl. of John Wilson (Doc. No. 122) ¶ 2.) More specifically, "[o]f the 114 Op Codes contained in the 1999 Specification, 98 Op Codes are identical (86%) to the 1996 specification." (Doc. No. 122, at ¶ 9.) Thus, there is no dispute that the May 1999 specifications incorporated in substantial part the specifications sent in 1996 under the Confidentiality Agreement and Amendment thereto.

The sole substantive issue confronting the Court is whether FasTrak's admitted use of the 1999 documentation to create the *505 Simulator* (and, by extension, the ULESS used in Control Technology's PLCs), given that the 1999 documentation incorporated in substantial part the version of Specification No. 2457707 provided by Siemens to FasTrak in 1996, means that FasTrak is in violation of any of its obligations to Siemens.

### III. DISCUSSION

#### A. The Defendants' Motions

In response to the defendants' motions, Siemens raises first the argument that the motions were filed after the expiration of the scheduling order's deadline (July 20, 2007) for filing dispositive motions,

and that the defendants did not seek an extension or exception to the deadline. However, the Court recognizes that in its prior Order and Memorandum Opinion it basically invited the defendants to renew their motions after completion of discovery. The Order denying the first motions for summary judgment was entered after expiration of the dispositive motion deadline. Because trial is nigh and a ruling on the motions has the possibility of narrowing the issues remaining for trial, the Court will exercise its discretion to rule on the motions, despite the fact that they fall outside the parameters of the Case Management Order in effect in this case.

With respect to the substantive issue identified above, the parties are in basic agreement as to all material facts. Their divergent positions are based on their different interpretations of the term "Information" as used in the Software License Contract; specifically, they disagree as to whether the May 1999 Documentation provided to FasTrak by Siemens falls within that definition. For obvious reasons, Siemens argues that the May 1999 revised specifications are not "Information" covered by the Software License Contract, that Siemens provided the revised specifications simply as a matter of course and not necessarily in furtherance of the *505 Workshop* project, and that, regardless, trade-secret information conveyed under the original Confidentiality Agreement retains its confidential character even if re-disclosed later along with other information that, because it was admittedly new, would fall under the five-year confidentiality provision contained in the Software License Contract. More specifically, according to John Wilson, who was part of the Siemens team charged with testing the *505 WorkShop* software but was not involved in negotiating the Software License Contract, the "Information" FasTrak would need from Siemens under the Software License Contract

> consisted of written information that included (1) technical term definitions and explanations needed to finalize the look and feel of SoftShop and (2) detailed problem report descriptions from [Siemens] testing efforts. "INFORMATION" that [Siemens] provided as "software in object form" were TISOFT PLC user programs for validating corrective actions of the aforementioned written SoftShop problem reports. The TISOFT programs were written in RLL and are compiled into object code when they are saved to disk. The "INFORMATION" did not include the Op-Code programming language and descriptions required to develop the RLL Editor as included in Series 500/505 Standard Programming Controller Language (specification no. 2457707) that [Siemens] provided to FasTrak under the Confidentiality Agreement, but instead included high-level user application programs.

(Doc. No. 84. at ¶ 3.) Siemens further argues that the specifications at issue were not necessary to FasTrak's development of the *505 Workshop* software, because work on that software was essentially

completed by the time the parties entered into the Software License Contract and, in fact, the first products licensed under the Software License Contract were shipped by Siemens as early as January 1997. (Doc. No. 85, at ¶ 11.)

FasTrak, of course, argues that the revised specifications were clearly "Information" relating to the *505 Workshop* project conveyed in connection with the Software License Contract, that Siemens knew at the time it executed that Contract that it would be required to provide FasTrak with updated and revised specifications pertaining to the 505 Product Line as they became available, and that the merger clause in the Software License Contract means that any information provided in furtherance of the project at issue in the Software License Contract would be subject to the five-year confidentiality limitation in that Contract. FasTrak further argues that "Information" from Siemens necessarily included any documentation necessary for FasTrak to continue to develop the 505 WorkShop software and ensure that it continued to be compatible with Siemens' 505 PLC. FasTrak also maintains that Siemens knew that work on the 505 Product Line was ongoing and that it would need to provide updated specifications to FasTrak in the future, as long as it continued to develop the 505 Product Line.

Neither side points to any case law in support of its claims, but the issue is one of pure contract law. The Software License Contract, by its terms, is governed by Wisconsin law. In Wisconsin, as in most states,

> [t]he lodestar of contract interpretation is the intent of the parties. In ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning. If the contract is unambiguous, [the courts] attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence.

*Huml v. Vlazny,* 716 N.W.2d 807, 820 (Wis. 2006) (citations omitted). Whether a term is ambiguous is a question of law. *Tang v. C.A.R.S. Protection Plus, Inc.*, 734 N.W.2d 169, 180 (Wis. Ct. App. 2007). The fact that the parties may later disagree as to the meaning of a contract term does not necessarily mean it is ambiguous as a matter of law. Contract language is considered ambiguous if it is susceptible of more than one reasonable interpretation. *Danbeck v. Am. Family Mut. Ins. Co.*, 629 N.W.2d 150, 154 (Wis. 2001). However, a word or phrase is not ambiguous simply because it is general or broad. *Yauger v. Skiing Enters., Inc.*, 538 N.W.2d 834, 839 (Wis. Ct. App. 1995), *rev'd on other grounds*, 557 N.W.2d 60 (1996). The contract is considered as a whole in order to give each of its provisions the meaning intended by the parties. *Pleasure Time, Inc. v. Kuss*, 254 N.W.2d 463, 467 (1977).

In light of these considerations, the Court finds that the term "Information" as used in the Software License Contract, though very broad, is not ambiguous, despite the parties' *post hoc* disagreement as to how it should be construed. Siemens' proposed construction of "Information" disregards its breadth and does not comport with the term as it is used in the Contract. *Cf. Weichman v. Krueger*, 2007 WL 521205, at *1 (Wis. Ct. App. Feb, 21, 2007) (agreeing with the trial court's conclusion that the term "including" means "including but not limited to"). The fact is that the specifications provided in May of 1999 were "written information of Siemens" pertaining to the 505 Product Line, and that the only conceivable reason for Siemens to send them to FasTrak at that time was in connection with the Software License Contract, under which the parties continued to operate.

Regardless of the fact that much of the information provided by Siemens at that time had been previously provided to FasTrak under the Confidentiality Agreement, the Software License Contract certainly did not include an obligation that FasTrak parse the information provided to it by Siemens after execution of the Software License Contract to determine whether any part of it had previously been produced. To the contrary, the merger clause at ¶ 14.3 of the Software License Contract effectively bars Siemens' argument that updated information provided after execution of the Software License Contract should somehow, to the extent the revised information duplicates that provided prior to execution of the Software License Contract, be excluded from the reach of the Software License Contract. If Siemens had intended to protect the Series 500/505 Standard Programmable Controller Language (Specification No. 2457707) and other specifications, it could—and should—have expressly so provided in the Software License Contract.

It did not do so; as a result, FasTrak is entitled to summary judgment in its favor as to all claims asserted against it, and Control Technology is entitled to summary judgment of those claims against it that rely on alleged misuse of Siemens' information by incorporating the ULESS into its PLCs.

**B.     Siemens' Motion**

For the same reasons set forth above, Siemens' cross motion for summary judgment will be denied.

## IV. CONCLUSION

For the reasons set forth herein, the defendants' respective motions for summary judgment and partial summary judgment will be granted. Siemens' cross-motion for summary judgment will be denied.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge